# BREININGER v. SHEET METAL WORKERS INTERNATIONAL ASSOCIATION LOCAL UNION NO. 6

No. 88–124.   Argued October 10, 1989—Decided December 5, 1989

68

BRENNAN, J., delivered the opinion for a unanimous Court with respect to Parts I and II, and the opinion of the Court with respect to Part III, in which REHNQUIST, C. J., and WHITE, MARSHALL, BLACKMUN, O'CONNOR, and KENNEDY, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, in which SCALIA, J., joined, *post*, p. 95.

*Francis J. Landry* argued the cause and filed briefs for petitioner.

*Deputy Solicitor General Shapiro* argued the cause for the United States as *amicus curiae* in support of petitioner. With him on the brief were *Acting Solicitor General Bryson, Stephen L. Nightingale, Joseph E. DeSio, Robert E. Allen, Norton J. Come, Linda Sher, Jerry G. Thorn, Allen H. Feldman, Steven J. Mandel,* and *Anne P. Fugett.*

*Laurence Gold* argued the cause for respondent. With him on the brief were *Jeffrey I. Julius* and *Marsha Berzon.**

JUSTICE BRENNAN delivered the opinion of the Court.

This case presents two questions under the federal labor laws: first, whether the National Labor Relations Board (NLRB or Board) has exclusive jurisdiction over a union member's claims that his union both breached its duty of fair representation and violated the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 73 Stat. 519, 29 U. S. C. § 401 *et seq.* (1982 ed.), by discriminating against him in job referrals made by the union hiring hall; and second, whether the union's alleged refusal to refer him to employment through the hiring hall as a result of his political opposition to the union's leadership gives rise to a claim under §§ 101(a)(5) and 609 of the LMRDA, 29 U. S. C. §§ 411(a)(5), 529 (1982 ed.). The Court of Appeals for the Sixth Circuit held that petitioner's suit fell within the exclusive jurisdiction of the Board and that petitioner had failed to state a claim

---

*Briefs of *amici curiae* urging reversal were filed for the Association for Union Democracy et al. by *Paul Alan Levy, Alan B. Morrison,* and *Arthur L. Fox II;* and for the National Right to Work Legal Defense Foundation by *Rossie D. Alston, Jr.,* and *Glenn M. Taubman.*

under the LMRDA. 849 F. 2d 997 (1988) *(per curiam)*. We reverse the Court of Appeals' decision as to jurisdiction, but we affirm its holding that petitioner did not state a claim under LMRDA §§ 101(a)(5) and 609.

## I

Petitioner Lynn L. Breininger was at all relevant times a member of respondent, Local Union No. 6 of the Sheet Metal Workers International Association. Pursuant to a multi-employer collective-bargaining agreement, respondent operates a hiring hall through which it refers both members and nonmembers of the union for construction work. Respondent maintains an out-of-work list of individuals who wish to be referred to jobs. When an employer contacts respondent for workers, he may request certain persons by name. If he does not, the union begins at the top of the list and attempts to telephone in order each worker listed until it has satisfied the employer's request. The hiring hall is not the exclusive source of employment for sheet metal workers; they are free to seek employment through other mechanisms, and employers are not restricted to hiring only those persons recommended by the union.[1] Respondent also maintains a job referral list under the Specialty Agreement, a separate collective-bargaining agreement negotiated to cover work on siding, decking, and metal buildings.

Petitioner alleges that respondent refused to honor specific employer requests for his services and passed him over in making job referrals. He also contends that respondent refused to process his internal union grievances regarding

---

[1] The word "exclusive" when used with respect to job referral systems is a term of art denoting the degree to which hiring is reserved to the union hiring hall. Hiring is deemed to be "exclusive," for example, if the union retains sole authority to supply workers to the employer up to a designated percentage of the work force or for some specified period of time, such as 24 or 48 hours, before the employer can hire on his own. See *Carpenters, Local 608 (Various Employers)*, 279 N. L. R. B. 747, 754 (1986), enf'd, 811 F. 2d 149 (CA2), cert. denied, 484 U. S. 817 (1987).

these matters. Petitioner's first amended complaint contained two counts. First, he asserted a violation of the duty of fair representation, contending that respondent, "in its representation of [petitioner], has acted arbitrarily, discriminatorily, and/or in bad faith and/or without reason or cause." First Amended Complaint ¶ 13. Second, petitioner alleged that his union, "in making job referrals, . . . has favored a faction of members . . . who have been known to support . . . the present business manager," as "part of widespread, improper discipline for political opposition in violation of 29 U. S. C. [§ 411(a)(5)] and 29 U. S. C. § 529." *Id.*, ¶ 17. Respondent, in other words, "acting by and through its present business manager . . . and its present business agent [has] 'otherwise disciplined'" petitioner within the meaning of LMRDA §§ 101(a)(5) and 609. *Id.*, ¶ 16.

The District Court held that it lacked jurisdiction to entertain petitioner's suit because "discrimination in hiring hall referrals constitutes an unfair labor practice," and "[t]he NLRB has exclusive jurisdiction over discrimination in hiring hall referrals." No. C 83–1126 (ND Ohio, Feb. 20, 1987), p. 6, reprinted in App. to Pet. for Cert. A9. The District Court determined that adjudicating petitioner's claims "would involve interfe[r]ing with the NLRB's exclusive jurisdiction." *Id.*, at 7, App. to Pet. for Cert. A10.

The Court of Appeals affirmed in a brief *per curiam* opinion. With respect to the fair representation claim, the court noted that "[c]ircuit courts have consistently held that . . . fair representation claims must be brought before the Board" and that "if the employee fails to affirmatively allege that his *employer* breached the collective bargaining agreement, which [petitioner] failed to do in the case at bar, he cannot prevail." 849 F. 2d, at 999 (emphasis in original). In regard to the LMRDA count, the Court of Appeals found that "[d]iscrimination in the referral system, because it does not breach the employee's union membership rights, does not constitute 'discipline' within the meaning of LMRDA" and

that "[h]iring hall referrals are not a function of union membership since referrals are available to nonmembers as well as members." *Ibid.* We granted certiorari. 489 U. S. 1009 (1989).

## II

### A

We have long recognized that a labor organization has a statutory duty of fair representation under the National Labor Relations Act (NLRA), 49 Stat. 449, as amended, 29 U. S. C. § 151 *et seq.* (1982 ed.), "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca* v. *Sipes,* 386 U. S. 171, 177 (1967); see also *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192, 203 (1944). In *Miranda Fuel Co.,* 140 N. L. R. B. 181 (1962), enf. denied, 326 F. 2d 172 (CA2 1963), the NLRB determined that violations of the duty of fair representation might also be unfair labor practices under § 8(b) of the NLRA, as amended, 29 U. S. C. § 158(b) (1982 ed.).[2] The Board held that the right of employees under § 7 of the NLRA, as amended, 29 U. S. C. § 157, to form, join, or assist labor organizations, or to refrain from such activities, "is a statutory limitation on statutory bargaining representatives, and . . . that Section 8(b)(1)(A) of the Act

---

[2] Section 8(b)(1)(A) provides that it is an unfair labor practice for a labor organization or its agents to restrain or coerce "employees in the exercise of the rights guaranteed in section 157 of this title [§ 7 of the NLRA]: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." 29 U. S. C. § 158(b)(1)(A) (1982 ed.). Section 8(b)(2) makes it an unfair labor practice for a labor organization or its agents "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." § 158(b)(2).

accordingly prohibits labor organizations, when acting in a statutory representative capacity, from taking action against any employee upon considerations or classifications which are irrelevant, invidious, or unfair." 140 N. L. R. B., at 185. In addition, the Board reasoned that "a statutory bargaining representative and an employer also respectively violate Section 8(b)(2) and 8(a)(3) when, for arbitrary or irrelevant reasons or upon the basis of an unfair classification, the union attempts to cause or does cause an employer to derogate the employment status of an employee." *Id.*, at 186. While petitioner alleged a breach of the duty of fair representation, his claim might relate to conduct that under *Miranda Fuel* also constitutes an unfair labor practice. And, as a general matter, neither state nor federal courts possess jurisdiction over claims based on activity that is "arguably" subject to §§ 7 or 8 of the NLRA. See *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 245 (1959).

Nevertheless, the District Court was not deprived of jurisdiction. In *Vaca* v. *Sipes, supra,* we held that *Garmon's* pre-emption rule does not extend to suits alleging a breach of the duty of fair representation. Our decision in *Vaca* was premised on several factors. First, we noted that courts developed and elaborated the duty of fair representation before the Board even acquired statutory jurisdiction over union activities. Indeed, fair representation claims often involve matters "not normally within the Board's unfair labor practice jurisdiction," 386 U. S., at 181, which is typically aimed at "effectuating the policies of the federal labor laws, not [redressing] the wrong done the individual employee," *id.*, at 182, n. 8. We therefore doubted whether "the Board brings substantially greater expertise to bear on these problems than do the courts." *Id.*, at 181. Another consideration in *Vaca* for finding the fair representation claim judicially cognizable was the NLRB General Counsel's unreviewable discretion to refuse to institute unfair labor practice proceedings. "[T]he General Counsel will refuse to bring complaints on be-

half of injured employees when the injury complained of is 'insubstantial.'" *Id.*, at 183, n. 8. The right of the individual employee to be made whole is "[o]f paramount importance," *Bowen* v. *United States Postal Service,* 459 U. S. 212, 222 (1983), and "[t]he existence of even a small group of cases in which the Board would be unwilling or unable to remedy a union's breach of duty would frustrate the basic purposes underlying the duty of fair representation doctrine," *Vaca, supra,* at 182–183. Consequently, we were unwilling to assume that Congress intended to deny employees their traditional fair representation remedies when it enacted § 8(b) as part of the Labor Management Relations Act, 1947 (LMRA). As JUSTICE WHITE described *Vaca* v. *Sipes* last Term in *Karahalios* v. *Federal Employees,* 489 U. S. 527, 535 (1989):

> "As we understood our inquiry, it was whether Congress, in enacting § 8(b) in 1947, had intended to oust the courts of their role enforcing the duty of fair representation implied under the NLRA. We held that the 'tardy assumption' of jurisdiction by the NLRB was insufficient reason to abandon our prior cases, such as *Syres* [v. *Oil Workers,* 350 U. S. 892 (1955)]."

That a breach of the duty of fair representation might also be an unfair labor practice is thus not enough to deprive a federal court of jurisdiction over the fair representation claim. See *Communications Workers* v. *Beck,* 487 U. S. 735, 743 (1988).

We decline to create an exception to the *Vaca* rule for fair representation complaints arising out of the operation of union hiring halls. Although the Board has had numerous opportunities to apply the NLRA to hiring hall policies,[3] we

---

[3] The Board has determined that a labor organization that is the statutory collective-bargaining representative of employees utilizing its exclusive hiring hall is barred from using unfair, irrelevant, or invidious considerations in making referrals of such employees. See *Journeymen Pipe Fitters, Local No. 392,* 252 N. L. R. B. 417, 421 (1980), enf. denied, 712 F.

reject the notion that the NLRB ought to possess exclusive jurisdiction over fair representation complaints in the hiring hall context because it has had experience with hiring halls in the past.[4]  As an initial matter, we have never suggested that the *Vaca* rule contains exceptions based on the subject matter of the fair representation claim presented, the relative expertise of the NLRB in the particular area of labor law involved, or any other factor.  We are unwilling to begin the process of carving out exceptions now, especially since we

---

2d 225 (CA6 1983) *(per curiam)*.  The Board has held that "any departure from established exclusive hiring hall procedures which results in a denial of employment to an applicant falls within that class of discrimination which inherently encourages union membership, breaches the duty of fair representation owed to all hiring hall users, and violates Section 8(b)(1)(A) and (2), unless the union demonstrates that its interference with employment was pursuant to a valid union-security clause or was necessary to the effective performance of its representative function."  *Operating Engineers, Local 406,* 262 N. L. R. B. 50, 51 (1982), enf'd, 701 F. 2d 504 (CA5 1983) *(per curiam);* see also *Teamsters, Local No. 174 (Totem Beverages, Inc.),* 226 N. L. R. B. 690, 698–700 (1976); *Boilermakers, Local Lodge 169 (Riley Stoker Corp.),* 209 N. L. R. B. 140, 144–145 (1974).  Deviation from clear and unambiguous standards in refusing to refer an employee for work establishes a prima facie violation of §§ 8(b)(1)(A) and 8(b)(2), irrespective of whether the deviation is related to discrimination based on union membership.  See *NLRB* v. *International Association of Bridge, Structural and Ornamental Iron Workers,* 600 F. 2d 770, 776–777 (CA9 1979), cert. denied, 445 U. S. 915 (1980); *International Association of Heat and Frost Insulation, Local 22 (Rosendahl, Inc.),* 212 N. L. R. B. 913 (1974).  The Board in some cases has found unfair labor practices based on discriminatory referrals by nonexclusive hiring halls.  See *Iron Workers, Local 577 (Tri-State Steel Erectors),* 199 N. L. R. B. 37 (1972); *Hoisting and Portable Engineers, Local No. 4 (Carlson Corp.),* 189 N. L. R. B. 366 (1971), enf'd, 456 F. 2d 242 (CA1 1972); *Chauffeurs' Union, Local 923, Teamsters (Yellow Cab Co.),* 172 N. L. R. B. 2137, 2138 (1968); cf. *Teamsters, Local 17,* 251 N. L. R. B. 1248, 1256–1259 (1980).  We intimate no views on the merits of any of the Board's decisions.

[4] That the Board has joined an *amicus* brief supporting petitioner shows that it does not share respondent's concern that its jurisdiction is being invaded in this case.  See *Motor Coach Employees* v. *Lockridge,* 403 U. S. 274, 298, n. 8 (1971).

see no limiting principle to such an approach. Most fair representation cases require great sensitivity to the tradeoffs between the interests of the bargaining unit as a whole and the rights of individuals.[5] Furthermore, we have never indicated that NLRB "experience" or "expertise" deprives a court of jurisdiction over a fair representation claim. The Board has developed an unfair labor practice jurisprudence in many areas traditionally encompassed by the duty of fair representation. The Board, for example, repeatedly has applied the *Miranda Fuel* doctrine in cases involving racial discrimination. See *International Brotherhood of Painters, Local 1066 (W. J. Siebenoller, Jr., Paint Co.)*, 205 N. L. R. B. 651, 652 (1973); *Houston Maritime Assn., Inc. (Longshoremen Local 1351)*, 168 N. L. R. B. 615, 616–617 (1967), enf. denied, 426 F. 2d 584 (CA5 1970); *Cargo Handlers, Inc. (Longshoremen Local 1191)*, 159 N. L. R. B. 321, 322–327 (1966); *United Rubber Workers, Local No. 12 (Business League of Gadsden)*, 150 N. L. R. B. 312, 314–315 (1964), enf'd, 368 F. 2d 12 (CA5 1966), cert. denied, 389 U. S. 837 (1967); *Automobile Workers, Local 453 (Maremont Corp.)*, 149 N. L. R. B. 482, 483–484 (1964); *Longshoremen, Local 1367 (Galveston Maritime Assn., Inc.)*, 148 N. L. R. B. 897, 897–900 (1964), enf'd, 368 F. 2d 1010 (CA5 1966), cert. denied, 389 U. S. 837 (1967); *Independent Metal Workers, Local No. 1 (Hughes Tool Co.)*, 147 N. L. R. B. 1573, 1574 (1964); see also *Handy Andy, Inc.*, 228 N. L. R. B. 447, 455–456 (1977). In addition, the Board has found gender discrimination by unions to be an unfair labor practice. See *Wolf Trap Foundation for the Performing Arts*, 287 N. L. R. B. 1040 (1988), 127 LRRM 1129, 1130 (1988); *Olympic S. S. Co.*, 233 N. L. R. B. 1178, 1189 (1977); *Glass Bottle Blowers Assn.*,

---

[5] "Complexity," for example, has never prevented us from holding that unions must arbitrate grievances fairly, see *Vaca* v. *Sipes*, 386 U. S. 171 (1967); *Conley* v. *Gibson*, 355 U. S. 41 (1957), despite the difficult tradeoffs in grievance processing between individual rights and collective welfare.

*Local 106 (Owens-Illinois, Inc.)*, 210 N. L. R. B. 943, 943–944 (1974), enf'd, 520 F. 2d 693 (CA6 1975); *Pacific Maritime Assn. (Longshoremen and Warehousemen, Local 52)*, 209 N. L. R. B. 519, 519–520 (1974) (Member Jenkins, concurring). In short, "[a] cursory review of Board volumes following *Miranda Fuel* discloses numerous cases in which the Board has found the duty of fair representation breached where the union's conduct was motivated by an employee's lack of union membership, strifes resulting from intraunion politics, and racial or gender considerations." *United States Postal Service*, 272 N. L. R. B. 93, 104 (1984). Adopting a rule that NLRB expertise bars federal jurisdiction would remove an unacceptably large number of fair representation claims from federal courts.

Respondent calls to our attention language in some of our decisions recognizing that "[t]he problems inherent in the operation of union hiring halls are difficult and complex, and point up the importance of limiting initial competence to adjudicate such matters to a single expert federal agency." *Journeymen and Apprentices* v. *Borden*, 373 U. S. 690, 695 (1963) (citation omitted). For this reason, respondent contends that "[w]hether a hiring hall practice is discriminatory and therefore violative of federal law is a determination Congress has entrusted to the Board." *Farmer* v. *Carpenters*, 430 U. S. 290, 303, n. 12 (1977). The cases cited by respondent, however, focus not on whether unions have administered properly out-of-work lists as required by their duty of fair representation, but rather on whether exclusive hiring halls have encouraged union membership impermissibly as forbidden by § 8(b). Such exclusive arrangements are not illegal *per se* under federal labor law, but rather are illegal only if they in fact result in discrimination prohibited by the NLRA. See *Teamsters* v. *NLRB*, 365 U. S. 667, 673–677 (1961); see also *Woelke & Romero Framing, Inc.* v. *NLRB*, 456 U. S. 645, 664–665 (1982). We have found *state law* pre-empted on the ground that "Board ap-

proval of various hiring hall practices would be meaningless if state courts could declare those procedures violative of the contractual rights implicit between a member and his union." *Farmer, supra,* at 300, n. 9. These state-law claims frequently involve tort, contract, and other substantive areas of law that have developed quite independently of federal labor law. Cf. *Lingle* v. *Norge Division of Magic Chef, Inc.,* 486 U. S. 399, 403–406 (1988); *Electrical Workers* v. *Hechler,* 481 U. S. 851, 855–859 (1987); *Allis-Chalmers Corp.* v. *Lueck,* 471 U. S. 202, 211 (1985); *Teamsters* v. *Lucas Flour Co.,* 369 U. S. 95, 103–104 (1962).

The duty of fair representation is different. It has "judicially evolved," *Motor Coach Employees* v. *Lockridge,* 403 U. S. 274, 301 (1971), as part of federal labor law—predating the prohibition against unfair labor practices by unions in the 1947 LMRA. It is an essential means of enforcing fully the important principle that "no individual union member may suffer invidious, hostile treatment at the hands of the majority of his coworkers." *Ibid.;* see also *United Parcel Service, Inc.* v. *Mitchell,* 451 U. S. 56, 63 (1981) ("[T]he unfair representation claim made by an employee against his union . . . is more a creature of 'labor law' as it has developed . . . than it is of general contract law"). The duty of fair representation, unlike state tort and contract law, is part of federal labor policy. Our "refusal to limit judicial competence to rectify a breach of the duty of fair representation rests upon our judgment that such actions cannot, in the vast majority of situations where they occur, give rise to actual conflict with the operative realities of federal labor policy." *Lockridge, supra,* at 301; see also *Vaca,* 386 U. S., at 180–181 ("A primary justification for the pre-emption doctrine—the need to avoid conflicting rules of substantive law in the labor relations area and the desirability of leaving the development of such rules to the administrative agency created by Congress for that purpose—is not applicable to cases involving alleged

breaches of the union's duty of fair representation"). We therefore decline to interpret the state-law pre-emption cases as establishing a principle that hiring halls are somehow so different from other union activities that fair representation claims are not cognizable outside of the NLRB.

The Court of Appeals below also held that if an employee fails to allege that his *employer* breached the collective-bargaining agreement, then he cannot prevail in a fair representation suit against his *union*. See 849 F. 2d, at 999. This is a misstatement of existing law. In *Vaca*, we identified an "intensely practical consideratio[n]," 386 U. S., at 183, of having the same entity adjudicate a joint claim against both the employer and the union when a wrongfully discharged employee who has not obtained relief through any exclusive grievance and arbitration procedures provided in the collective-bargaining agreement brings a breach-of-contract action against the employer pursuant to § 301(a) of the LMRA, 61 Stat. 156, 29 U. S. C. § 185(a) (1982 ed.). We noted that where the union has control of the grievance and arbitration system, the employee-plaintiff's failure to exhaust his contractual remedies may be excused if the union has wrongfully refused to process his claim and thus breached its duty of fair representation. See *Vaca*, 386 U. S., at 185–186. "[T]he wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as a bargaining agent breached its duty of fair representation in its handling of the employee's grievance." *Id.*, at 186.

Our reasoning in *Vaca* in no way implies, however, that a fair representation action *requires* a concomitant claim against an employer for breach of contract. Indeed, the earliest fair representation suits involved claims against unions for breach of the duty in *negotiating* a collective-bargaining agreement, a context in which no breach-of-contract action against an employer is possible. See *Ford Motor Co.* v.

*Huffman,* 345 U. S. 330 (1953); *Steele* v. *Louisville & Nashville R. Co.,* 323 U. S. 192 (1944). Even after a collective-bargaining agreement has been signed, we have never required a fair representation plaintiff to allege that his *employer* breached the agreement in order to prevail. See, *e. g., Communications Workers* v. *Beck,* 487 U. S., at 743; *Czosek* v. *O'Mara,* 397 U. S. 25, 29 (1970). "[A]n action seeking damages for injury inflicted by a breach of a union's duty of fair representation [is] judicially cognizable in any event, that is, even if the conduct complained of [is] arguably protected or prohibited by the National Labor Relations Act *and whether or not the lawsuit [is] bottomed on a collective agreement."* *Motor Coach Employees* v. *Lockridge, supra,* at 299 (emphasis added).

Respondent argues that the concern in *Vaca* that suits against the employer and union be heard together in the same forum is applicable to the hiring hall situation, because any action by petitioner against an employer would be premised not on § 301 but rather on the contention that the employer had knowledge of the union conduct violating § 8(b)(1)(A) and acted on that knowledge in making an employment decision.[6] The employer would thereby violate

---

[6] We accept respondent's characterization of the employer's liability only for the purpose of argument. We note that the Board traditionally had imposed strict liability on an employer party to an exclusive hiring hall, solely on the basis of its being a party to the arrangement and even in the absence of proof that it had knowledge of the union's discriminatory practices. See *Frank Mascali Construction G. C. P. Co.,* 251 N. L. R. B. 219, 222 (1980), enf'd, 697 F. 2d 294 (CA2), cert. denied, 459 U. S. 988 (1982); *Longshoremen, Local 1351 (Galveston Marine Assn., Inc.),* 122 N. L. R. B. 692, 696 (1958); *Operating Engineers Local 12 (Associated General Contractors),* 113 N. L. R. B. 655, 661, n. 5 (1955), modified on other grounds, 237 F. 2d 670 (CA9 1956), cert. denied, 353 U. S. 910 (1957). The Board has recently abandoned the strict liability principle, holding instead that "no liability should be imposed when an employer does not have actual notice, or may not reasonably be charged with notice of a union's discriminatory operation of a referral system." *Wolf Trap Foundation for the Performing Arts,* 287 N. L. R. B. 1040, 1041 (1988), 127

NLRA § 8(a)(3), 29 U. S. C. § 158(a)(3), see *Wallace Corp.* v. *NLRB*, 323 U. S. 248, 255–256 (1944), and be held jointly and severally liable with the union, *but only in a suit before the Board.*[7]  In the hiring hall environment, permitting courts to hear fair representation claims against the union would create the danger of bifurcated proceedings before a court and the NLRB.  The absence of a § 301 claim, according to respondent, requires that we hold that the NLRB possesses exclusive jurisdiction over petitioner's fair representation suit.

This argument misinterprets our reasoning in *Vaca*.  Because a plaintiff must as a matter of logic prevail on his unfair representation allegation against the union in order to excuse his failure to exhaust contractual remedies before he can litigate the merits of his § 301 claim against his employer, we found it "obvious that the courts will be compelled to pass upon whether there has been a breach of the duty of fair representation in the context of many § 301 breach-of-contract actions."  386 U. S., at 187.  Moreover, because the union's breach may have enhanced or contributed to the employee's injury, permitting fair representation suits to be heard in court facilitates the fashioning of a remedy.  *Ibid.* We concluded that it made little sense to prevent courts from adjudicating fair representation claims.

The situation in the instant case is entirely different.  In the hiring hall context, the Board may bring a claim alleging a violation of § 8(b)(1)(A) against the union, and a parallel suit against the employer under § 8(a)(3), without implicating the duty of fair representation at all.  Or, as in the instant case, an employee may bring a claim solely against the union based on its wrongful refusal to refer him for work.  While in *Vaca*

LRRM 1129, 1130 (1988).  We express no view regarding the standard for liability of any of the employers in the instant case.

[7] We need not determine whether plaintiffs in petitioner's position *could* make out a § 301 claim.  We simply note that petitioner in his first amended complaint did not allege a breach of contract by any employer.

an allegation that the union had breached its duty of fair representation was a necessary component of the § 301 claim against the employer, the converse is not true here: a suit against the union need not be accompanied by an allegation that an employer breached the contract, since whatever the employer's liability, the employee would still retain a legal claim against the union. The fact that an employee *may* bring his fair representation claim in federal court in order to join it with a § 301 claim does not mean that he *must* bring the fair representation claim before the Board in order to "join" it with a hypothetical unfair labor practice case against the employer that was never actually filed.

Federal courts have jurisdiction to hear fair representation suits whether or not they are accompanied by claims against employers. We have always assumed that independent federal jurisdiction exists over fair representation claims because the duty is implied from the grant of exclusive representation status, and the claims therefore "arise under" the NLRA. See, *e. g., Tunstall* v. *Locomotive Firemen & Enginemen,* 323 U. S. 210, 213 (1944). Lower courts that have addressed the issue have uniformly found that 28 U. S. C. § 1337(a), which provides federal jurisdiction for, *inter alia,* "any civil action or proceeding arising under any Act of Congress regulating commerce," creates federal jurisdiction over fair representation claims, because we held in *Capital Service, Inc.* v. *NLRB,* 347 U. S. 501, 504 (1954), that the NLRA is an "Act of Congress regulating commerce." See *Chavez* v. *United Food & Commercial Workers Int'l Union,* 779 F. 2d 1353, 1355, 1356 (CA8 1985); *Anderson* v. *United Paperworkers Int'l Union,* 641 F. 2d 574, 576 (CA8 1981); *Buchholtz* v. *Swift & Co.,* 609 F. 2d 317, 332 (CA8 1979), cert. denied, 444 U. S. 1018 (1980); *Mumford* v. *Glover,* 503 F. 2d 878, 882–883 (CA5 1974); *Retana* v. *Apartment, Motel, Hotel & Elevator Operators Local 14,* 453 F. 2d 1018, 1021–1022 (CA9 1972); *De Arroyo* v. *Sindicato de Trabajadores Packinghouse,* 425 F. 2d 281, 283, n. 1 (CA1), cert. denied, 400

U. S. 877 (1970); *Nedd* v. *United Mine Workers of America,* 400 F. 2d 103, 106 (CA3 1968); see also *Bautista* v. *Pan American World Airlines, Inc.,* 828 F. 2d 546, 549 (CA9 1987). We agree with this reasoning. Because federal-court jurisdiction exists over a fair representation claim regardless of whether it is accompanied by a breach-of-contract claim against an employer under § 301,[8] and because a fair representation claim is a separate cause of action from any possible suit against the employer, we decline to adopt a rule that exclusive jurisdiction lies in the NLRB over any fair representation suit whose hypothetical accompanying claim against the employer might be raised before the Board.

The concerns that animated our decision in *Vaca* are equally present in the instant case. The Court of Appeals erred in holding that the District Court was without jurisdiction to hear petitioner's fair representation claim.

## B

Respondent contends that even if jurisdiction in federal court is proper, petitioner has failed to allege a fair representation claim for two reasons.

---

[8] The development of the law in the § 301 context is not to the contrary. We have recognized that although a § 301 suit against the employer and a fair representation claim against the union are "inextricably interdependent," *United Parcel Service, Inc.* v. *Mitchell,* 451 U. S. 56, 66–67 (1981) (Stewart, J., concurring in judgment), breach of the duty of fair representation is a cause of action separate from the claim against the employer. See *DelCostello* v. *Teamsters,* 462 U. S. 151, 164, 165 (1983) (noting that a hybrid fair representation/§ 301 suit "comprises two causes of action" and that "[t]he employee may, if he chooses, sue one defendant and not the other"); *United Parcel Service,* 451 U. S., at 66 (Stewart, J., concurring in judgment) (§ 301 and fair representation claim each has "its own discrete jurisdictional base"); *id.,* at 73, n. 2 (STEVENS, J., concurring in part and dissenting in part) ("[D]espite this close relationship, the two claims are not inseparable. Indeed, although the employee in this case chose to sue both the employer and the union, he was not required to do so; he was free to institute suit against either one as the sole defendant").

## 1

First, respondent notes that we have interpreted NLRA § 8(a)(3) to forbid employer discrimination in hiring only when it is intended to discriminate on a union-related basis. See, e. g., *NLRB* v. *Brown*, 380 U. S. 278, 286 (1965). Respondent maintains that symmetry requires us to interpret § 8(b)(2) as forbidding only discrimination based on union-related criteria and not any other form of maladministration of a union job referral system.[9] Respondent contends that under this standard it committed no unfair labor practice in this case. The LMRA, according to respondent, reflects a purposeful

[9] Respondent contends that § 8(b)(1)(A) should be construed *in pari materia* with § 8(b)(2) as requiring a showing of union-related discrimination. See *Teamsters* v. *NLRB*, 365 U. S. 667, 676 (1961) (§ 8(b)(1) condemns a hiring hall "which in fact is used to encourage and discourage union membership by discrimination in regard to hire or tenure, term or condition of employment"); *Local 277, Int'l Brotherhood of Painters* v. *NLRB*, 717 F. 2d 805, 808–809 (CA3 1983); *NLRB* v. *Local Union 633, United Assn. of Journeymen and Plumbers*, 668 F. 2d 921, 922–923 (CA6 1982) *(per curiam); NLRB* v. *Local 143, Moving Picture and Projection Machine Operators Union*, 649 F. 2d 610, 612 (CA8 1981). The NLRB, however, has construed §§ 8(b)(1)(A) and 8(b)(2) more expansively to bar the use of unfair, irrelevant, or invidious considerations in employee referrals of employees, and to prohibit, absent sufficient justification by the union, any departure from established procedures. See n. 3, *supra*. We need not pass on the wisdom of the Board's interpretation, because we hold that whatever the proper reading of § 8(b), petitioner has stated a claim for breach of the duty of fair representation. We note, however, that respondent's arguments are inconsistent. On the one hand, respondent contends that courts should not entertain fair representation suits because to do so would disturb NLRB efforts to create a uniform unfair labor practice body of law governing hiring halls. On the other hand, respondent maintains that the NLRB rules with respect to hiring hall unfair labor practices are actually in excess of what the statute authorizes. If that is so, the NLRB does not seem particularly "expert" in this area. Moreover, if the NLRB's hiring hall rules are void because they are beyond what the statute permits, then there is no overlap between the duty of fair representation and the unfair labor practices developed by the Board, and there is in fact *less* reason to hold that courts lack jurisdiction over hiring hall fair representation claims.

congressional decision to limit the scope of § 8(b)(2) to instances where a union discriminates solely on the basis of union membership or lack thereof. This decision would be negated if the duty of fair representation were construed as extending further than the unfair labor practice provisions of the NLRA.

We need not decide the appropriate scope of §§ 8(b)(1)(A) and 8(b)(2) because we reject the proposition that the duty of fair representation should be defined in terms of what is an unfair labor practice. Respondent's argument rests on a false syllogism: (a) because *Miranda Fuel Co.*, 140 N. L. R. B. 181 (1962), enf. denied, 326 F. 2d 172 (CA2 1963), establishes that a breach of the duty of fair representation is also an unfair labor practice, and (b) the conduct in this case was not an unfair labor practice, therefore (c) it must not have been a breach of the duty of fair representation either. The flaw in the syllogism is that there is no reason to equate breaches of the duty of fair representation with unfair labor practices, especially in an effort to *narrow* the former category. The NLRB's rationale in *Miranda Fuel* was precisely the opposite; the Board determined that breaches of the duty of fair representation were also unfair labor practices in an effort to *broaden*, not *restrict*, the remedies available to union members. See 140 N. L. R. B. at 184–186.[10] Pegging the duty of fair representation to the Board's definition of unfair labor practices would make the two redundant, despite their different purposes, and would eliminate some of the prime virtues of the duty of fair representation—flexibility and adaptability. See *Vaca*, 386 U. S., at 182–183.

The duty of fair representation is not intended to mirror the contours of § 8(b); rather, it arises independently from

---

[10] Similarly, in deciding not to enforce *Miranda Fuel*, the Second Circuit explicitly rejected a crabbed view of the duty of fair representation and juxtaposed a statement of the narrowness of § 8 with an acknowledgment that the duty of fair representation is a broader concept. See 326 F. 2d, at 176. No decision of this Court has held otherwise.

the grant under § 9(a) of the NLRA, 29 U. S. C. § 159(a) (1982 ed.), of the union's exclusive power to represent all employees in a particular bargaining unit.  It serves as a "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law."  *Vaca, supra,* at 182; see also *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175, 181 (1967) ("It was because the national labor policy vested unions with power to order the relations of employees with their employer that this Court found it necessary to fashion the duty of fair representation").  Respondent's argument assumes that enactment of the LMRA in 1947 somehow limited a union's duty of fair representation according to the unfair labor practices specified in § 8(b).  We have never adopted such a view, and we decline to do so today.

2

Second, respondent insists that petitioner has failed to state a claim because in the hiring hall setting a union is acting essentially as an employer in matching up job requests with available personnel.  Because a union does not "represent" the employees as a bargaining agent in such a situation, respondent argues that it should be relieved entirely of its duty of fair representation.[11]

We cannot accept this proposed analogy.  Only because of its status as a Board-certified bargaining representative

---

[11] Respondent's argument would require us to find that there is no duty of fair representation at all in the hiring hall context; this is a position which cannot be reconciled with numerous decisions of the Courts of Appeals and the NLRB.  See, *e. g., Lewis* v. *Local 100, Laborers' Int'l Union,* 750 F. 2d 1368, 1376 (CA7 1984); *Beriault* v. *Local 40, Super Cargoes & Checkers of Int'l Longshoremen's Union,* 501 F. 2d 258, 264–266 (CA9 1974); *Smith* v. *Local No. 25, Sheet Metal Workers Int'l Assn.,* 500 F. 2d 741, 748–749 (CA5 1974); *Operating Engineers, Local 406,* 262 N. L. R. B., at 51, 57; *Carpenters, Local 608 (Various Employers),* 279 N. L. R. B., at 754–755; *Journeymen Pipe Fitters, Local No. 392,* 252 N. L. R. B., at 421–422; *Bricklayers' and Stonemasons' Int'l Union, Local No. 8,* 235 N. L. R. B. 1001, 1006–1008 (1978).

and by virtue of the power granted to it by the collective-bargaining agreement does a union gain the ability to refer workers for employment through a hiring hall. Together with this authority comes the responsibility to exercise it in a nonarbitrary and nondiscriminatory fashion, because the members of the bargaining unit have entrusted the union with the task of representing them. That the particular function of job referral resembles a task that an employer might perform is of no consequence. The key is that the union is administering a provision of the contract, something that we have always held is subject to the duty of fair representation. "The undoubted broad authority of the union as exclusive bargaining agent in the negotiation *and administration* of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation." *Humphrey* v. *Moore*, 375 U. S. 335, 342 (1964) (emphasis added). See *Communications Workers* v. *Beck*, 487 U. S., at 739; *Hines* v. *Anchor Motor Freight, Inc.*, 424 U. S. 554, 564 (1976); see also *Electrical Workers* v. *Hechler*, 481 U. S., at 861–862; *id.*, at 865 (STEVENS, J., concurring in part and dissenting in part).

In *Vaca* v. *Sipes, supra*, for example, we held that a union has a duty of fair representation in grievance arbitration, despite the fact that NLRA § 9(a) expressly reserves the right of "any individual employee or group of employees . . . to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect." The union in *Vaca* exercised power over grievances because the contract so provided, not because the NLRA required such an arrangement. Hence, the observation that a contract might provide for the operation of a hiring hall directly by a consortium of interested employers rather than a union is irrelevant; the same might have been said about the system for processing grievances in *Vaca*. In

short, a union does not shed its duty of fair representation merely because it is allocating job openings among competing applicants, something that might be seen as similar to what an employer does.

The union's assumption in the hiring hall of what respondent believes is an "employer's" role in no way renders the duty of fair representation inapplicable. When management administers job rights outside the hiring hall setting, arbitrary or discriminatory acts are apt to provoke a strong reaction through the grievance mechanism. In the union hiring hall, however, there is no balance of power. If respondent is correct that in a hiring hall the union has assumed the mantle of employer, then the individual employee stands alone against a single entity: the joint union/employer. An improperly functioning hiring hall thus resembles a closed shop, "'with all of the abuses possible under such an arrangement, including discrimination against employees, prospective employees, members of union minority groups, and operation of a closed union.'" *Teamsters* v. *NLRB*, 365 U. S., at 674 (quoting S. Rep. No. 1827, 81st Cong., 2d Sess., 14 (1947)); see also Note, Unilateral Union Control of Hiring Halls: The Wrong and the Remedy, 70 Yale L. J. 661, 674 (1961). In sum, if a union does wield additional power in a hiring hall by assuming the employer's role, its responsibility to exercise that power fairly *increases* rather than *decreases*. That has been the logic of our duty of fair representation cases since *Steele* v. *Louisville & Nashville R. Co.*, 323 U. S., at 200.[12]

---

[12] It was for this reason that the Board sought in its decision in *Mountain Pacific Chapter, Associated General Contractors*, 119 N. L. R. B. 883, enf. denied, 270 F. 2d 425 (CA9 1959), to require an exclusive hiring hall to incorporate certain procedural safeguards in the agreement establishing the exclusive arrangement. Although we held in *Teamsters* v. *NLRB*, 365 U. S. 667 (1961), that the Board's approach in *Mountain Pacific* exceeded the mandate of the NLRA, our decision in that case was confined to the unfair labor practice context and did not purport to determine the proper scope of the duty of fair representation. In addition, we were careful to note that the Board retained authority "to determin[e] whether

We reject respondent's contention that petitioner's complaint fails to state a fair representation claim.

## III

The Court of Appeals rejected petitioner's LMRDA claim on the ground that petitioner had failed to show that he was "otherwise disciplined" within the meaning of LMRDA §§ 101(a)(5) and 609, 29 U. S. C. §§ 411(a)(5) and 529 (1982 ed.). These provisions make it unlawful for a union to "fin[e], suspen[d], expe[l], or otherwise disciplin[e]" any of its members for exercising rights secured under the LMRDA.[13] The Court of Appeals reasoned that because "[h]iring hall referrals . . . are available to nonmembers as well as to members," 849 F. 2d, at 999, and the hiring hall was not an exclusive source of employment for sheet metal workers, petitioner did not suffer discrimination on the basis of rights he held by virtue of his *membership* in the union. We affirm the Court of Appeals' conclusion, although we do not adopt its reasoning.[14]

In *Finnegan* v. *Leu,* 456 U. S. 431 (1982), we held that removal from appointive union employment is not within the scope of § 609's prohibitions, because that section was "meant to refer only to punitive actions diminishing membership rights, and not to termination of a member's status as an appointed union employee." *Id.,* at 438 (footnote omitted).

---

discrimination has in fact been practiced" and to "eliminat[e] discrimination" in the operation of hiring halls. 365 U. S., at 677. *Teamsters* held invalid only the Board's attempt to impose prophylactic safeguards on hiring halls in the absence of any particularized findings of discrimination. It has no bearing on the instant case—a suit by an individual member of the union alleging specific acts in violation of the duty of fair representation.

[13] The phrase "otherwise disciplin[e]" appears in both §§ 101(a)(5) and 609, and we have already determined that it has the same meaning in both sections. See *Finnegan* v. *Leu,* 456 U. S. 431, 439, n. 9 (1982).

[14] The Court of Appeals clearly had jurisdiction over the LMRDA claim. See *Boilermakers* v. *Hardeman,* 401 U. S. 233, 238 (1971). To the extent the Court of Appeals held otherwise, it was in error.

Petitioner, joined by the United States as *amicus curiae*, argues that the Court of Appeals misapplied our reasoning in *Finnegan*, because Congress could not have intended to prohibit a union from expelling a member of the rank-and-file from a members-only hall for his political opposition to the union leadership, but to permit the leadership to impose the same sanction if the hiring hall included a few token nonmembers as well. Either way, the purpose of the Act would hardly be served if a union were able to coerce its members into obedience by threatening them with a loss of job referrals. Under the reading urged by the United States, *Finnegan* held only that the LMRDA does not protect the positions and perquisites enjoyed exclusively by union leaders; it did not narrow the protections available to "nonpolicymaking employees, that is, rank-and-file member-employees." *Finnegan, supra,* at 443 (BLACKMUN, J., concurring).

We need not decide the precise import of the language and reasoning of *Finnegan*, however, because we find that by using the phrase "otherwise discipline," Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules. "Discipline is the criminal law of union government." Summers, The Law of Union Discipline, 70 Yale L. J. 175, 178 (1960). The term refers only to actions "undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership." *Miller* v. *Holden,* 535 F. 2d 912, 915 (CA5 1976).

Our construction of the statute is buttressed by its structure. First, the specifically enumerated types of discipline—fine, expulsion, and suspension—imply some sort of established disciplinary process rather than ad hoc retaliation

by individual union officers.[15]   See 2A C. Sands, Sutherland on Statutory Construction § 47.17, p. 166 (4th ed. 1984) *(ejusdem generis)*.   Second, § 101(a)(5) includes procedural protections — "written specific charges" served before discipline is imposed, "a reasonable time" in which to prepare a defense, and a "full and fair hearing" — that would not apply to instances of unofficial, *sub rosa* discrimination.   These protections contemplate imposition of discipline through the type of procedure we encountered in *Boilermakers* v. *Hardeman*, 401 U. S. 233, 236–237 (1971) (expulsion after trial before union committee, with subsequent internal union review).   The fact that § 101(a)(5) does not prohibit union discipline altogether, but rather seeks to provide "safeguards against improper disciplinary action," indicates that "discipline" refers to punishment that a union can impose by virtue of its own authority over its members.   A hiring hall could hardly be expected to provide a hearing before every decision *not* to refer an individual to a job.

The legislative history supports this interpretation of "discipline."   Early drafts of § 101(a)(5), for example, contained elaborate lists of "due process protections," such as the presumption of innocence, venue restrictions, the right to counsel, the right to confront and cross-examine witnesses, and

---

[15] We do not imply that "discipline" may be defined solely by the type of punishment involved, or that a union might be able to circumvent §§ 101 (a)(5) and 609 by developing novel forms of penalties different from fines, suspensions, or expulsions.   Even respondent acknowledges that a suspension of job referrals through the hiring hall could qualify as "discipline" if it were imposed as a sentence on an individual by a union in order to punish a violation of union rules.   Contrary to JUSTICE STEVENS' suggestion, *post*, at 99–100, and nn. 7, 8, we do not hold that discipline can result only from "formal" proceedings, as opposed to "informal" or "summary" ones. We note only that Congress' reference to punishments typically imposed by the union as an entity through established procedures indicates tha Congress meant "discipline" to signify penalties applied by the union in it official capacity rather than ad hoc retaliation by individual union officers

other guarantees typically found in the criminal context.[16] Congress envisioned that "discipline" would entail the imposition of punishment by a union acting in its official capacity. See 105 Cong. Rec. 5812 (1959) (remarks of Sen. McClellan) (referring to "safeguards . . . against improper disciplinary action" as procedures that must be followed before a union member can be "expelled or punished," "tried," or "suspend[ed]" by the union); *id.*, at 6023 (remarks of Sen. Kuchel) (noting that discipline may be imposed only on "the usual reasonable constitutional basis upon which [criminal] charges might be brought").

A forerunner of § 101(a)(5) in the Senate provided criminal penalties for *both* improper "discipline" by "any *labor organization,* its officers, agents, representatives, or employees" *and* the use by *"any person* . . . of force or violence, or . . . economic reprisal or threat thereof, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercising by such member of any right to which he is entitled under the provisions of this Act." S. 1555, as reported, 86th Cong., 1st Sess., 53 (1959) (emphasis added); see also S. Rep. No. 187, 86th Cong., 1st Sess., 53–54, 94 (1959); 105 Cong. Rec. 15120 (1959) (comments of Sen. Goldwater). Although S. 1555 was not passed in this form by the Senate,[17] the fact that even in an earlier bill improper *discipline by a labor organization* was listed separately from *economic coercion by any person* shows that the

---

[16] See, *e. g.,* H. R. 4473, 86th Cong., 1st Sess., 12–16 (1959); H. R. 7265, 86th Cong., 1st Sess., 19–20 (1959); S. 1137, 86th Cong., 1st Sess., 11 (1959).

[17] We traced the legislative history of §§ 101(a)(5) and 609 in *Hardeman,* 401 U. S., at 242–245, and *Finnegan,* 456 U. S., at 435–441. The relevant portion of S. 1555 as passed became LMRDA § 610, 29 U. S. C. § 530 (1982 ed.), which criminalizes the threat or use of force or violence to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of rights granted under the LMRDA. Section 610 does not by its terms extend to economic reprisals.

Senate believed that the two were distinct, and that it did not intend to include the type of unauthorized "economic reprisals" suffered by petitioner in the instant case in its definition of "discipline." The bipartisan compromise bill introduced by Representatives Landrum and Griffin, which amended S. 1555 after its passage by the Senate, substituted civil remedies for the criminal penalties. Representative Griffin explained that the bill covered only the "denial of . . . rights through *union discipline*," 105 Cong. Rec. 13091 (1959) (emphasis added), an apparent reference to penalties imposed by the union in its official capacity as a labor organization. Discipline "must be done in the name of or on behalf of the union as an organizational entity." Etelson & Smith, Union Discipline Under the Landrum-Griffin Act, 82 Harv. L. Rev. 727, 732 (1969).

In the instant case, petitioner alleged only that the union business manager and business agent failed to refer him for employment because he supported one of their political rivals. He did not allege acts by the union amounting to "discipline" within the meaning of the statute. According to his complaint, he was the victim of the personal vendettas of two union officers. The opprobrium of the union *as an entity*, however, was not visited upon petitioner. He was not punished by any tribunal, nor was he the subject of any proceedings convened by respondent. In sum, petitioner has not alleged a violation of §§ 101(a)(5) and 609, and the Court of Appeals correctly dismissed his claim under the LMRDA.[18]

---

[18] We do not pass on petitioner's claim that certain of his rights secured by the LMRDA were "infringed" by respondent's conduct, in violation of § 102, 29 U. S. C. § 412 (1982 ed.), because the claim was neither presented to nor decided by the Court of Appeals below, and thus is not properly before us. See *Delta Air Lines, Inc.* v. *August*, 450 U. S. 346, 362 (1981). In addition, the § 102 issue is not included within the relevant question on which we granted certiorari ("Whether a union's discriminatory refusal to refer its members to jobs constitutes 'discipline' within the meaning of the [LMRDA]?").

## IV

We express no view regarding the merits of petitioner's claim. We hold only that the Court of Appeals erred when it determined that the District Court lacked jurisdiction over the suit, but that the Court of Appeals correctly found that petitioner failed to state a claim under §§ 101(a)(5) and 609 of the LMRDA. We remand the cause for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SCALIA joins, concurring in part and dissenting in part.

When school officials inflict corporal punishment on a schoolchild, we speak of the child being "disciplined."[1] A prison inmate who is summarily deprived of "good time" credits is also subjected to "discipline."[2] So too is the soldier who as a result of misconduct is required by a superior to perform additional duties.[3] In none of these cases is the discipline imposed by a "tribunal" or as a result of a "proceeding convened by" the disciplinary official. *Ante,* at 94. Rather, what distinguishes the punishment as "discipline" is that it is imposed by one in control with a view to correcting behavior that is considered to be deviant. The Court today holds, however, that a union member who is deprived of work referrals as a result of his intraunion political activities, conduct deemed by the union to be deviant, is nonetheless not being

---

[1] See, *e. g., Ingraham* v. *Wright,* 430 U. S. 651 (1977) (use of corporal punishment, without predeprivation hearing, as means of disciplining schoolchildren); *Goss* v. *Lopez,* 419 U. S. 565, 580 (1975) (suspension from school without hearing as form of discipline).

[2] See, *e. g., Preiser* v. *Rodriguez,* 411 U. S. 475, 478–481 (1973) (unauthorized deprivation of prison good time credits as form of discipline).

[3] See Manual for Courts-Martial, United States, 1968, Ch. 26 (detailing forms of nonjudicial disciplinary punishment for minor offenses).

subjected to discipline. Although I join the Court's analysis and disposition of petitioner's duty of fair representation claim in Parts I and II of its opinion, I cannot join this restrictive interpretation of the LMRDA.

Title I of the LMRDA, the "Bill of Rights" of labor organizations, "was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan* v. *Leu*, 456 U. S. 431, 435 (1982). These took at least two forms. First, many unions were run autocratically and did not accord their members the right of self-governance. See *Sheet Metal Workers* v. *Lynn*, 488 U. S. 347, 356, n. 8 (1989); *Steelworkers* v. *Sadlowski*, 457 U. S. 102, 112 (1982). Accordingly, Congress decreed that union members would have equal voting rights and the freedom of speech and assembly and provided in § 102, 29 U. S. C. § 412 (1982 ed.), a means of enforcing these rights through a civil cause of action in federal court. Second, there was evidence that unions imposed discipline on their members in violation of their members' civil rights or without adequate procedural safeguards.[4] See *Finnegan*, 456 U. S., at 442 (Congress was concerned with "protecting the rights of union members from arbitrary action by the union or its officers") (emphasis deleted); *Boilermakers* v. *Hardeman*, 401 U. S. 233, 243–245 (1971). The provisions which address these concerns,

---

[4] The Court is mistaken in suggesting that the predecessor to § 101 (a)(5), which distinguished between improper discipline imposed by a union and the use of economic reprisal by any person to interfere with the exercise of protected rights, signifies congressional intent that discipline not include economic reprisal. *Ante*, at 93–94. That provision, which was later embodied in § 610 of the Act, is addressed to attempts to interfere with rights protected by the substantive provisions of Title I and not to the arbitrary imposition of discipline at which the procedural provisions were aimed. It does not follow, as the Court seems to assume, that because Congress did not prohibit "all acts that deterred the exercise of rights protected under the LMRDA," *ante*, at 91, that it also intended to permit unions to employ this particularly powerful sanction without any procedural safeguards.

LRMDA §§ 101(a)(5)[5] and 609,[6] 29 U. S. C. §§ 411(a)(5), 529 (1982 ed.), are written in expansive language. They respectively prohibit the imposition of discipline by any labor "organization or any officer thereof," § 411(a)(5), and "any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof." § 529. And they refer not only to fines, suspension, and expulsion, the usual sanctions imposed by a union, but also to unspecified means by which the union "otherwise discipline[s]" its members.

As a matter of plain language, "discipline" constitutes "punishment by one in authority . . . with a view to correction or training." Webster's Third New International Dictionary 644 (1976); see also Random House Dictionary of the English Language 562 (2d ed. 1987) ("punishment inflicted by way of correction and training"); 4 Oxford English Dictionary 735 (2d ed. 1989) (same). Union discipline is thus punishment imposed by the union or its officers "to control the member's conduct in order to protect the interests of the union or its membership." *Miller* v. *Holden*, 535 F. 2d 912, 915 (CA5 1976). It easily includes the use of a hiring hall system by one who is charged with administering it to punish a member for his political opposition. Indeed, the express

---

[5] Section 101(a)(5), as set forth in 29 U. S. C. § 411(a)(5) (1982 ed.), provides:

"No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing."

[6] Section 609, as set forth in 29 U. S. C. § 529 (1982 ed.), provides:

"It shall be unlawful for any labor organization, or any officer, agent, shop steward, or other representative of a labor organization, or any employee thereof to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter. The provisions of section 412 of this title shall be applicable in the enforcement of this section."

reference in the Act to "fines," a form of discipline that traditionally was not imposed after a trial, suggests that Congress intended the Act to reach discipline that is both informal and affects only a member's economic rights.

Moreover, as a matter of the statute's purpose and policy, it would make little sense to exclude the abuse of a hiring hall to deprive a member of job referrals from the type of discipline against which the union member is protected. Congress intended the LMRDA to prevent unions from exercising control over their membership through measures that did not provide adequate procedural protection. "[I]nterference with employment rights constitute[s] a powerful tool by which union leaders [can] control union affairs, often in violation of workers' membership rights." *Vandeventer* v. *Local Union No. 513, Int'l Union of Operating Engineers*, 579 F. 2d 1373, 1378 (CA8 1978); see also Etelson & Smith, Union Discipline Under the Landrum-Griffin Act, 82 Harv. L. Rev. 727, 732 (1969) ("Since the prime motivation to join a union is concern about one's interests as an employee, it seems manifest that a very effective method of disciplining a union member would be to cause injury to those interests"). It is inconceivable that a statute written so broadly would not include such sanctions within its compass.

The Court nonetheless concludes that the denial of hiring hall referrals is not properly attributable to the union and does not constitute discipline within the meaning of the LMRDA. The Court errs in its construction of petitioner's complaint and in its interpretation of the LMRDA. At this pleading stage, petitioner's allegations must be accepted as true and his complaint may be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon* v. *King & Spaulding*, 467 U. S. 69, 73 (1984); *Conley* v. *Gibson*, 355 U. S. 41, 45–46 (1957). Petitioner alleges "that in failing to refer him for employment . . . the defendant, acting by and through its present business manager, David Williams,

and its present business agent, Michael Duffy, have 'otherwise disciplined' plaintiff.'"   The union's abuse of the hiring hall system is further said to have "been part of widespread, improper discipline for political opposition."   App. to Pet. for Cert. A–21.   The Court elsewhere acknowledges that "the ability to refer workers for employment through a hiring hall" is a power of the *union* granted it by the collective-bargaining agreement, *ante*, at 88, and it properly concludes that petitioner's allegations are sufficient to support the imposition of liability upon the union for breaching its duty of fair representation.   Petitioner's allegation that the union's officers used their union-granted authority over the hiring hall to punish him for his union activities should also be sufficient to support the claim that punishment was imposed "under color of" the union's right to control its membership and that the "opprobrium of the union *as an entity*" was "visited upon petitioner."   *Ante*, at 94.

The Court states that the discriminatory use of the hiring hall to punish petitioner does not constitute discipline because it is not an "established disciplinary process" or imposed by "any tribunal" or as the result of "any proceeding." *Ante*, at 91, 94.   But, as Congress was well aware,[7] discipline can be imposed informally as well as formally and pursuant to unwritten practices similar to those petitioner has alleged as well as to a formal established policy.   The language and structure of the Act do not evince any intention to restrict its coverage to sanctions that are imposed by tri-

---

[7] Contemporaneous sources are replete with examples of discipline imposed informally and through summary procedures.   See, *e. g.*, National Industrial Conference Board, Studies in Personnel Policy, No. 150, Handbook of Union Government Structure and Procedures 71–72 (1955) ("A few unions make specific statements in their constitutions that members are to be disciplined without trial for certain offenses. . . . These unions have a membership of 569,857"); Note, The Power of Trade Unions to Discipline Their Members, 96 U. Pa. L. Rev. 537, 541 (1948) ("[H]earings indicate the existence of physical violence and 'goon squad' activity as a less formal means of disciplining opposing factions").

bunals or as the result of proceedings. That Congress specified detailed procedures to be followed in disciplinary proceedings does not mean that no procedures need be followed when discipline is imposed without any proceeding whatsoever. Nor does the legislative history, which reflects Congress' intention to prevent a wide range of arbitrary union action, support such a crabbed reading.[8] By holding that the informally imposed sanctions alleged here are not covered by the LMRDA, the Court ironically deprives union members of the protection of the Act's procedural safeguards at a time when they are most needed—when the union or its officers act so secretly and so informally that the member receives no advance notice, no opportunity to be heard, and no explanation for the union's action. This construction of the labor organization's "Bill of Rights" is perverse and cannot have been intended by Congress.

Finally, this case is not controlled, as the Court of Appeals concluded, by our decision in *Finnegan* v. *Leu*, 456 U. S. 431 (1982). In that case, we held that removal from appointive union employment did not constitute discipline within the meaning of § 609. *Id.*, at 437; see also *Sheet Metal Workers* v. *Lynn*, 488 U. S., at 353, n. 5. We stated that "it was rank-and-file union members—not union officers or employees, as such—whom Congress sought to protect," 456 U. S., at 437, and that "Congress [did not] inten[d] to establish a system of job security or tenure for appointed union employees," *id.*, at 438. In his brief for the United States as

---

[8] Indeed, even union officials testified before Congress that union disciplinary methods were informal and discipline was imposed by workers. See, *e. g.*, Hearings on H. R. 3540, H. R. 3302, H. R. 4473, and H. R. 4474 before a Joint Subcommittee of the House Committee on Education and Labor, 86th Cong., 1st Sess., pt. 4, p. 1483 (1959) (testimony of George Meany, President of American Federation of Labor and Congress of Industrial Organizations (AFL–CIO)); see also 105 Cong. Rec. App. 3294 (1959) (AFL–CIO Legislative Department Analysis of Provisions in Senator McClellan's Amendment) ("Often disciplinary proceedings are usually wholly informal").

*Amicus Curiae,* the Solicitor General has cogently explained why *Finnegan* is not controlling:

"The question presented by this case is far different. Here, participation in the Union's job referral program is a benefit enjoyed by all members of the Union within the bargaining unit, and the issue is whether withdrawal of the benefit can be deemed 'discipline' even though that benefit may also be extended to non-members of the Union. *Finnegan*'s emphasis on the distinction between union members and union leaders does not apply to this situation. In fact, the court of appeals' reliance on language in *Finnegan* that drew that distinction turns the Court's approach on its head. *Finnegan*'s conclusion that the Act did not protect the positions and perquisites enjoyed only by union leaders was surely not intended to narrow the class of benefits, enjoyed by the rank-and-file, that cannot be withdrawn in retaliation for the exercise of protected rights.

"The court of appeals implicitly acknowledged (see Pet. App. A3) that participation in a job referral system limited to union members would be a part of 'a union member's rights or status *as a member of the union*' (456 U. S. at 437). The fact that non-members may be included within the system should not alter that characterization. In either case, when a union member's removal from or demotion on an out-of-work list is based upon a violation of a union rule or policy, or political opposition to the union's leadership, the removal or demotion can fairly be characterized as a punitive action taken against the member *as a member* that sets him apart from other members of the rank-and-file. See *id.* at 437–438. Moreover, such an action bears enough similarity to the specific disciplinary actions referred to in Section 609 to fall within the residual category of

sanctions—encompassed by the phrase 'otherwise disciplined'—that are subject to that provision."[9]

Today the Court correctly refuses to adopt the Court of Appeals' reasoning, but its rationale is just as flawed as that of the Court of Appeals. Retaliation effected through a union job referral system is a form of discipline even if the system is used by nonmembers as well as members and even if the sanction is the result of an *ex parte*, ad hoc, unrecorded decision by the union.

I respectfully dissent from the Court's disposition of petitioner's claim under the Labor-Management Reporting and Disclosure Act of 1959.

---

[9] Brief for United States as *Amicus Curiae* 19–20 (footnote omitted). Most of the Courts of Appeals that have considered the issue have properly concluded that depriving a member of job referrals and other forms of economic reprisals can constitute discipline under the LMRDA. See *Guidry v. International Union of Operating Engineers, Local 406*, 882 F. 2d 929, 940–941 (CA5 1989); *Murphy v. International Union of Operating Engineers, Local 18*, 774 F. 2d 114, 122–123 (CA6 1985), cert. denied, 475 U. S. 1017 (1986); *Keene v. International Union of Operating Engineers*, 569 F. 2d 1375 (CA5 1978); see also *Moore v. Local 569, Int'l Brotherhood of Electrical Workers*, 653 F. Supp. 767 (SD Cal. 1987); T. Kheel, Labor Law § 43.06[4], 43–105 (1986); Beaird & Player, Union Discipline of its Membership Under Section 101(a)(5) of Landrum-Griffin: What is "Discipline" and How Much Process is Due?, 9 Ga. L. Rev. 383, 392 (1975); Etelson & Smith, Union Discipline Under the Landrum-Griffin Act, 82 Harv. L. Rev. 727, 733 (1969). But see Comment, Applicability of LMRDA Section 101 (a)(5) to Union Interference with Employment Opportunities, 114 U. Pa. L. Rev. 700 (1966). Two Courts of Appeals have held that suspension of a member from a nonexclusive job referral system did not constitute discipline when such suspension was required by the terms of the collective-bargaining agreement. See *Turner v. Local Lodge No. 455, Int'l Brotherhood of Boilermakers*, 755 F. 2d 866, 869–870 (CA11 1985); *Hackenburg v. International Brotherhood of Boilermakers*, 694 F. 2d 1237, 1239 (CA10 1982); see also *Figueroa v. National Maritime Union of America*, 342 F. 2d 400 (CA2 1965) (although interference with employment opportunities is covered by Act, union's compliance with collective-bargaining agreement in refusing to refer seaman does not constitute discipline).